# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER A. SEIFER,

                    Petitioner,

v.                                      Case No. 16-CV-1465-JPS

UNITED STATES OF AMERICA,

                    Respondent.                 **ORDER**

## 1.    INTRODUCTION

On June 19, 2014, Petitioner Christopher A. Seifer ("Seifer") was convicted by a jury of four counts of mail fraud and one count of theft of government property. On September 19, 2014, Seifer was sentenced to fifteen months imprisonment to be followed by three years of supervised release. (Docket #1 at 2). After his direct appeal concluded, Seifer filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 on November 1, 2016. *See generally id.* Respondent opposed the motion on May 3, 2017. (Docket #24). Seifer offered a reply on May 15, 2017. (Docket #27). For the reasons explained below, Seifer's motion must be denied.

## 2.    BACKGROUND

In its opinion on Seifer's direct appeal, the Seventh Circuit succinctly described the basic facts of his case:

> Seifer worked for the Bureau of Prisons at the Federal Correctional Institution in Oxford, Wisconsin. He injured his back on the job, and the Department of Labor's Office of Workers' Compensation Programs [("OWCP")] determined that he had a permanent work-related disability. This designation entitled him to reimbursement for travel expenses incurred for medical treatments. To obtain

reimbursement Seifer completed and submitted a form OWCP–957. A private administrator, Xerox, processed these forms and issued Seifer reimbursement checks for trips to health clubs and gyms, where he reportedly was using heated pools to rehabilitate his back.

From March 2006 to October 2012, Seifer submitted more than 1,300 reimbursement claims for travel to facilities with pools. Most of these claims were false. At the Prairie Athletic Club, for example, his reimbursement forms show 858 visits between March 2006 and August 2009, yet his key card was swiped only 17 times. At another club, Adventure 212, Seifer was not a member from February through April 2011, but during those months he purportedly had traveled to the club and used the pool 37 times. Overall, Seifer netted more than $80,000 from his fraudulent travel claims.

*United States v. Seifer*, 800 F.3d 328, 329 (7th Cir. 2015).

Seifer's instant motion offers two different theories as to why his trial counsel, Louis Sirkin ("Sirkin"), provided him ineffective legal assistance. First, Seifer contends that Sirkin failed to conduct a reasonable investigation into his defense. (Docket #1 at 6). Specifically, Seifer argues that Sirkin should have interviewed his wife, Cynthia Seifer ("Cynthia"), his stepson, Kevin Kern ("Kern"), and his neighbor, Dominic Ferraro ("Ferraro"), because each could have provided at least some corroboration of Seifer's testimony about making the therapy trips. (Docket #1-2 at 1-3; Docket #2 at 6-7). Second, Seifer maintains that Sirkin should have called each of these witnesses at trial to provide that testimony to the jury. (Docket #1 at 7). Seifer also alleges that Sirkin should have offered evidence of his automobile mileage during the relevant period as another potential source of corroboration. (Docket #1-2 at 3-4).[1]

---

[1]Seifer initially included this issue as part of his failure-to-investigate ground but has since withdrawn that aspect of the claim. (Docket #11).

**3.    LEGAL STANDARD**

The Court of Appeal's *Blake* opinion neatly summarizes the standards applicable to Seifer's motion:

> A party asserting ineffective assistance of counsel bears the burden of establishing two elements: (1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 . . . (1984)[.]
>
> To satisfy the first element of the *Strickland* test, appellant must direct the Court to specific acts or omissions by his counsel. In that context, the Court considers whether in light of all the circumstances counsel's performance was outside the wide range of professionally competent assistance. The Court's assessment of counsel's performance is "highly deferential[,] . . . indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" [*Id.* at 689.]
>
> . . .
>
> To satisfy the second *Strickland* element, appellant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable. A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome.

*Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citations and quotations omitted).

**4.    ANALYSIS**

Seifer's ineffective assistance claims turn on the evidence adduced at trial, the evidence Sirkin allegedly missed, and what Sirkin knew of or thought about each. In sum, the evidence at trial was as follows. Seifer's travel reimbursements were so enormous that they triggered an audit in 2011, which eventually led to his criminal prosecution. While the

government argued that Seifer's scheme to defraud spanned from 2006 to 2012, the actual charges referenced relatively limited specific time periods ranging from July 2010 to October 2012. *United States v. Christopher A. Seifer*, 14-CR-19-JPS (E.D. Wis.) (Docket #30). At trial, an agent of the Department of Labor testified that he analyzed Seifer's trips to determine which were actually supported by documentary evidence. The graphs and tables he produced, showing that vast majority of the trips were unsupported, were admitted into evidence. *See* (Docket #24-1, #24-2, and #24-3).

This evidence was buttressed by testimony and documents from the various health clubs Seifer claimed to have visited so frequently. Seifer submitted claims for visits to Prairie Athletic Club ("PAC") from 2006 to 2012. Of the 926 reimbursement requests for travel to PAC, only 17 were supported evidence that he actually swiped his membership card to gain access to PAC, either at the front door or the front desk. Seifer also sought reimbursement for 68 visits to PAC when he had no valid membership at all.[2] Seven of the claimed visit dates were days when the therapy pool was closed for cleaning.[3] Finally, PAC employees testified that they did not recognize Seifer, in particular the people who primarily staffed the therapy

---

[2]Seifer had in fact cancelled his membership in November 2009, stating that he was medically unable to go the gym. He e-mailed PAC in December 2012, inquiring about renewing his membership because he was now physically able to resume exercise. The 68 non-membership claims arose from May 2011 to January 2012.

[3]During September 2011, federal agents surveilled Seifer and, on days when he claimed trips to PAC, they testified that he never went there. Seifer claims that: 1) the agents were surveilling the wrong car, and 2) he often went to and returned from the pool therapy before the agents even began to watch him. (Docket #2 at 9 n.1). The government questions whether these propositions are entirely true. (Docket #24 at 12-13, 21). The surveillance issue is ultimately immaterial, so the Court gives no weight to the surveillance evidence.

pool area, and they would have if he had actually made 926 trips to their facility.

The story is similar for the UW Health Sports Fitness Center ("UW Fitness Center"), for which Seifer submitted claims from 2010 to 2012. Only 16 of his 291 visits to the UW fitness center were supported by both a valid membership and a swipe-in. Unlike PAC, where the swipe-in occurred at the front desk, an active membership card was needed to unlock the door to the UW Fitness Center. During the relatively limited periods where Seifer did have a valid membership, only ten percent of his claimed visits matched a swipe-in. At all other times, Seifer's only option was to sneak into the building, which the management staff testified would have been difficult, especially the nearly 200 times for which Seifer made claims. Seifer's reimbursement claims were also inconsistent with statements made to his medical providers around this time, which suggested that he *had not* been consistently using therapy pool treatment. And as with PAC, the staff at the UW Fitness Center did not recognize Seifer despite his purportedly extensive pool use.

Seifer also made claims for trips to the Princeton Club East ("PCE") between June and August 2011, despite never having a membership there. Seifer had been to the PCE a few times at the turn of 2011, and his physical therapist said she likely gave him a 12-day pass that was only valid for 60 days. Thus, it would have been no use to Seifer during the times he claims to have visited the facility. The PCE manager said that staff are trained to ensure that all people entering the facility have a valid membership. In his estimation, Seifer gaining unauthorized entry for his 60 claimed visits was ridiculous.

Two other facilities, Harbor Athletic Club ("HAC") and Adventure 212, allegedly received visits from Seifer. As to HAC, the visits came between March and June 2007. Seifer's PAC membership would have permitted him access to HAC, but he would still have been obliged to swipe-in. The facility had no record of such swipe-ins and management testified that staff would have stopped Seifer from entering without doing so. Seifer claimed to have gone to Adventure 212 from February to April 2011 while having no membership. As with the other facilities, there were no attendance records confirming Seifer's account. The manager testified that the front desk of Adventure 212 is always staffed, so Seifer could not have gained access at the time and in the manner he claimed.

Seifer's defense was largely a straightforward rebuttal of the government's evidence. He testified that he did in fact take every trip associated with every travel reimbursement claim form he submitted. Seifer further stated that he had no problem entering and using any facility even when he had no active membership. He would simply walk past the front desk, without swiping in, and claimed that this conduct was rarely challenged by staff. When he was stopped, he would produce a "guest pass" to allow him to enter. For PAC and the UW Fitness Center in particular, Seifer maintained that he did not know that he was supposed to swipe-in at those facilities. As to staff not recognizing him, Seifer countered that he often went to the pools very early in the morning and kept to himself.[4]

---

[4]The government counters that most of Seifer's swipe-ins, few as they were, occurred in the mid-morning or later. (Docket #24 at 21).

In the instant motion, Seifer adds the following evidence via affidavit testimony. Cynthia, now his wife, states that she began dating Seifer in September 2010 and moved in with him in April 2012. (Docket #18 at 1). Seifer regularly mentioned to Cynthia that he was going to the pool, and would send her text messages about his travel. *Id.* Before they lived together, Cynthia would occasionally wash Seifer's swimsuit, and afterwards, she did so with greater (though unspecified) regularity. *Id.* Cynthia further states that after she moved in, Seifer rarely drove his Chevy Impala save for going to his pool therapy or medical appointments. *Id.* Seifer otherwise drove Cynthia's own vehicle, a Ford Ranger. *Id.* at 2. Cynthia met with Sirkin twice during the pendency of Seifer's case, and she told him about both Seifer's vehicle use and that Kern and Ferraro might have relevant testimony. *Id.*

Kern, Seifer's stepson, states that he lived with Seifer for approximately six months in 2008. (Docket #19 at 1). He observed Seifer leaving home at 4:00 or 5:00 a.m., saying he was on his way to the gym. *Id.* Seifer would return at about 7:00 a.m. smelling of chlorine. *Id.* at 2. Kern also went with Seifer to the gym a few days each week. *Id.* at 1-2. Kern was never interviewed by Sirkin or the government. *Id.* at 2.

Ferraro, Seifer's former neighbor, lived a few doors away from Seifer in Westfield, Wisconsin from 2004 to 2013. (Docket #20 at 1). Ferraro sometimes saw Seifer leaving his home in the early morning hours, but he cannot remember any specific dates when this occurred. *Id.* Seifer spoke to Ferraro about his pool therapy but Ferraro does not recall how often Seifer said he went to that therapy. *Id.* Like Kern, Ferraro was not interviewed by Sirkin or the government, though he did provide a statement in the context of Seifer's sentencing. *Id.* at 1-2.

Seifer himself avers that he rarely drove the Impala except to therapy and other medical appointments. (Docket #23 at 1). He further states that his prior attorneys forwarded maintenance records for the Impala to Sirkin once he was hired. *Id.* Seifer says he told Sirkin about his vehicle use and the possibility of using Kern and Ferraro to corroborate his story. *Id.* at 1-2.

Sirkin states that he took over as Seifer's trial counsel in April 2014. (Docket #12-1). He understood that Seifer's defense was that the government's case was flat wrong—Seifer maintained that he in fact made the pool therapy trips for which he sought reimbursement. *Id.* Sirkin knew that Seifer went to therapy to treat his ongoing back pain, and that Seifer liked to go in the morning before the pools became crowded. *Id.* As to the lack of swipe ins at the various pool facilities, Seifer told Sirkin that because he used a cane or walker, it was easier for him to follow behind the person who opened the facility without the need to swipe in. *Id.*

Seifer's trial testimony tracked Sirkin's prior understanding. *Id.* Sirkin knew that the government's case was largely circumstantial, so the outcome of the case would turn on Seifer's credibility. *Id.* at 2. Sirkin claims that he was never made aware of Kern or Ferraro's potential testimony. *Id.* He considered Cynthia as a potential witness, but decided against using her in the face of the government's countervailing evidence for the years of 2006, 2007, and 2008. *Id.* Sirkin also knew about the mileage Seifer claimed to have put on the Impala driving to and from pool therapy. *Id.* Because the government did not appear to challenge the mileage evidence, Sirkin concluded that it was best to present that evidence through Seifer's testimony alone. *Id.*; (Docket #26).

Seifer's allegation of ineffective assistance of counsel fails on the second element—prejudice. This failure derives from his misapprehension

of the nature and effect of the testimony to be adduced from Cynthia, Kern, and Ferraro. The evidence at trial fostered a battle of credibility between Seifer on one hand, and the documentary evidence and facility employee testimony on the other. The critical ground for this battle was Seifer's claim that he simply walked in to the facilities, sometimes without a membership and rarely swiping in, simply by arriving early in the morning, following behind the employee opening the facility or other lawful patrons, or otherwise conning his way past the front desk. The facility employees and managers directly contradicted this claim, stating that it would have been nigh impossible for Seifer to have accomplished this so many times without them noticing or recognizing him from his repeated visits.

What Seifer needed in order to respond to the facility personnel was corroboration that someone saw him enter the facilities, get past the front desk, and get into the pools—day after day. Most of Cynthia, Kern, and Ferraro's testimony, however, has no bearing on this point, and Seifer acknowledges as much:

> The only portion of Seifer's account that is not directly corroborated by the new evidence – that he was able to enter the health clubs without swiping in – is corroborated indirectly by the facts that he told Kern, Ferraro, and Cynthia contemporaneously with the travel that he was going to Madison for the pool therapy, by the timing of his returns, by the otherwise unexplained mileage put on Seifer's car, and by the fact that Cynthia had to wash out his swimsuit on a regular basis.

(Docket #2 at 10).

Distilled to its essence, the government prosecution was for Seifer's deceit. It is reasonable to conclude that this deception extended to his family and friends, not just the OWCP. Thus, it is no stretch to infer from the

evidence presented that Seifer lied to Cynthia and Kern about going to the gym and left early in the morning to further that lie (roping in Ferraro as well). The mileage evidence falls into the same category of indirect, and thus unhelpful, proof of Seifer's pool therapy.

The points which might directly support Seifer's story are two. The first is Cynthia's handling of a wet swimsuit and Kern's detection of a chlorine smell upon Seifer's return home. These, of course, could be contrived to reinforce Seifer's overarching fraud. Further, the government's theory was not that every claim Seifer submitted was false. A smattering of actual pool visits makes the chlorine issue more believable for the prosecution; Seifer did not need to fake a chlorine smell each time he returned home. Finally, both Cynthia and Kern's observations were for relatively short periods within Seifer's overall scheme, which lasted from March 2006 to October 2012. From September 2010 to April 2012, Cynthia and Seifer did not live together, so her swimsuit-washing activity was only occasional. Only when they moved in together in April 2012 could Cynthia have directly observed Seifer leaving the house or returning with a wet swimsuit. Outside of a six-month period in 2008, Kern had nothing to say about Seifer's pool use.

The second potentially favorable piece of direct evidence is that Kern drove Seifer to the gym a couple of times per week. This might seem like perfect corroboration of Seifer's entry into and use of the facilities, but the omissions in Kern's testimony are glaring. Kern merely states that he "went with [Seifer] to Stevens Point a couple of times a week to the gym[.]"

(Docket #19 at 1).[5] Kern does not assert that he personally observed or knew of Seifer actually entering a gym, maneuvering past the front desk, and entering the therapy pool. Thus, as with the testimony of all of Seifer's witnesses, Kern does not offer anything which truly corroborates the lynchpin of Seifer's theory or which undermines the testimony of the facility employees.

To prove his claim of ineffective assistance of counsel, Seifer is required to show that "there is a reasonable probability that, but for [Sirkin's] errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable." *Blake*, 723 F.3d at 879. Seifer's testimony and the government's evidence, particularly the testimony of the facility employees, stand in direct opposition on Seifer's ability to enter and use the facilities. Most of Seifer's proposed witness testimony, by contrast, has no bearing on this point. Even that which arguably does, the portions of Cynthia's and Kern's testimony described above, is at best tangential.

In other words, the primary players at trial were the facility employees and Seifer himself, and the jury was called upon to weigh their respective levels of credibility. The jury assigned Seifer none, and accordingly found him guilty. The testimony of Cynthia, Kern, and Ferraro

---

[5]Kern's reference to "Stevens Point" is curious. The only facility Seifer visited in Stevens Point, Wisconsin is Adventure 212. The false claims for Adventure 212 were submitted in 2011, long after Kern's stay with Seifer ended. During the period of Kern's residence in 2008, PAC was the only target for Seifer's mileage claims. This discrepancy might be explained in a few ways: 1) a simple drafting error in Kern's affidavit; 2) it is evidence that Seifer went to Adventure 212 in 2008 and never made any travel claims; or 3) it calls into question Kern's recollection of the events from 2008 and his truthfulness generally.

raises a miniscule, and certainly less than a reasonable, probability that the outcome of the trial would have been different had their testimony been investigated or presented to the jury as Seifer desires. Their absence at trial did not make the proceeding fundamentally unfair.[6]

## 5.    CONCLUSION

Seifer's proffered testimony in no way shakes the Court's confidence as to the outcome of his trial. *Blake*, 723 F.3d at 879. His motion to vacate his sentence must, therefore, be denied.[7] Under Rule 11(a) of the Rules Governing Section 2255 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C.

---

[6]Seifer offers various critiques of the facility employees' testimony. These include claiming a lack of foundation that the employees who testified regularly worked at the time Seifer came to their facilities, the employees' bias in favor of "people believing that they or others invariably follow supposed pool policies," and the employees' potential lack of diligence in enforcing the swipe in rules in the early morning hours. (Docket #27 at 9-10). Seifer cannot now offer a cross-examination of the facility employees under the guise of an ineffective assistance claim. His opportunity to do so was at trial. Seifer's instant motion alleges no fault on Sirkin's part in examining witnesses.

[7]In light of the prior motion practice in this matter, Seifer may protest the lack of a hearing on his motion. For two reasons, the Court concludes that no hearing is necessary. First, the relevant facts, namely the testimony of Sirkin, Seifer, and the other witnesses, is almost entirely undisputed. As to any of the disputed evidence, such as the surveillance issue, it is immaterial to the outcome (and, in any event, the Court construed the evidence in Seifer's favor). Second, the affidavit testimony of Cynthia, Kern, and Ferraro confirms that Seifer's motion lacks merit. As noted above, the omissions in their testimony are as telling as what was included. Seifer might complain that he could have drawn out additional testimony upon live examination. This speculation is improper. The witnesses' affidavits were prepared in conjunction with Seifer's counsel and they should have included all relevant testimony. To the extent they are lacking in material detail (such as Kern's affidavit), it must be because the witnesses had no more specific testimony to offer.

§ 2253(c)(2), Seifer must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). As the Court discussed above, no reasonable jurists could debate whether Seifer's motion has merit because his evidence of ineffectiveness fell so far short of the required showing. As a consequence, the Court is compelled to deny a certificate of appealability as to Seifer's motion.

Accordingly,

**IT IS ORDERED** that Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability as to the Petitioner's motion be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2017.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge